**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE**

<u>Isaac Mwangi, Lisa Mwangi
and Safari Merchandise
Centre, LLC</u>

      v.                          Civil No. 06-cv-175-JM

<u>Zahid Alam and
Premium Gas, LLC, et al.</u>


**O R D E R**

This action arose out of an ill-fated business relationship between plaintiffs, Isaac and Lisa Mwangi, and defendants, Zahid Alam and Premium Gas, LLC, which gave rise to an agreement that plaintiffs would operate a convenience store and gasoline station on property in Manchester, New Hampshire that defendants owned. Confusion and disagreement about the terms of the business arrangement ultimately caused plaintiffs to lose their investment in the business and close up shop less than four months after opening. Alam formally evicted plaintiffs from the premises in March 2006. Plaintiffs then brought this suit to recover their losses. After a four day trial, the jury found defendants' treatment of plaintiffs constituted breach of contract and breach of the implied duty of good faith and fair dealing, and violated

the New Hampshire Consumer Protection Act, see New Hampshire Rev. Stat. Ann. ("RSA") 358-A (1995).  The jury awarded plaintiffs damages in the amount of $32,000, plus attorney's fees and costs.

As part of the relief sought, plaintiffs asked for enhanced damages, pursuant to RSA 358-A:10, I, which requires the court to double or triple a damage award if the violation was willful or knowing.  Evidentiary hearings regarding plaintiffs' requests for attorney's fees and enhanced damages were held on July 23, 2007, and October 4, 2007.[1]  After trial but before the evidentiary hearings, defendants obtained new counsel.  Defense counsel objects to plaintiffs' request for enhanced damages, but conceded the reasonableness of plaintiffs' counsel's fees at the July 23, 2007, hearing.  After carefully considering the parties' arguments, plaintiffs' request for enhanced damages is granted.

---

[1]Plaintiffs also had requested an attachment to secure payment of the judgment; however, Alam agreed to give them a mortgage on four parcels of real estate, which obviated the need for an attachment.  Before the mortgages were recorded, Alam granted at least one other mortgage on one of the properties to another creditor.  The October 4, 2007, hearing focused on that transaction and other real estate transfers which occurred in June 2007 to assess whether Alam was making these transfers in fraud of creditors.  Any claim plaintiffs may wish to assert relating to those transfers, however, must be made in state court and does not alter my analysis here.

<u>Discussion</u>

**1.  Enhancement of Damages**

The extent of enhanced damages plaintiffs may obtain is a question for the court, rather than the jury, to resolve.  <u>See</u> <u>Attrezzi, LLC v. Maytag Corp.</u>, 436 F.3d 32, 41 (1st Cir. 2006) (citing <u>Carter v. Lachance</u>, 146 N.H. 11, 14, 766 A.2d 717, 719 (2001)).  Plaintiffs are entitled to enhanced damages if defendants' violation of the Consumer Protection Act (either "CPA" or "RSA 358-A") was either knowing or willful.  <u>See</u> RSA 358-A:10, I.  When the CPA violation is determined to have been willful or knowing, the court *must* double or triple the damage award.  <u>See</u> <u>Simpson v. Young</u>, 153 N.H. 471, 476, 899 A.2d 216, 221 (2006) ("the legislature's use of the term 'shall' indicates mandatory enforcement"); <u>accord</u> <u>Unit Owners Ass'n v. Miller</u>, 141 N.H. 39, 45, 677 A.2d 138, 142 (1996).  Whether the amount is doubled or trebled, however, is within the court's discretion, considering the degree and egregiousness of the willful or knowing conduct.  <u>See</u> <u>Globe Distrib. Inc. v. Adolph Coors Co. (In re Globe Distrib., Inc.)</u>, 129 B.R. 304, 320 (Bankr. D.N.H. 1991) ("<u>In re Globe I</u>") (considering extenuating circumstances before doubling damages award).

3

Defendants object to plaintiffs request for enhanced damages, arguing the damage award cannot be increased because the jury did not find the CPA violation was either willful or knowing.  They cite the special verdict form, which did not specifically ask whether defendants' CPA violation was willful or knowing.  Based on my review of the entire record, however, I find that the issue of willfulness was adequately presented to, and was decided by, the jury.  Defendants' argument fails for the following two reasons.

First, the jury instructions, when read in their entirety and in context of the trial evidence, fairly explained that an issue for the jury to decide was whether or not the defendants acted willfully.  See U.S. v. McFarlane, 491 F.3d 53, 59 (1st Cir. 2007) (explaining that individual instructions must be reviewed in context); see also U.S. v. Tom, 330 F.3d 83, 91 (1st Cir. 2003) ("looking at the entire charge, in light of the evidence, and 'determin[ing] whether, taken as a whole, the court's instructions fairly and adequately submitted the issues in the case to the jury'" (internal quotation omitted)).  Plaintiffs did not allege that defendants conduct constituted one of the enumerated violations of the CPA, see RSA 358-A:2 (Supp.

4

2007) (listing specific acts and practices that violate the
statute), but rather that it generally constituted an unfair or
deceptive business practice.  The jury, therefore, was given the
following broader instruction about conduct that generally
offends the spirit and policy of the CPA:

> A practice may be considered "unfair" if it is
> immoral, unethical, oppressive or unscrupulous.
> A practice may be considered "deceptive" if it
> could reasonably be found to have caused a
> person to act differently from the way he otherwise
> would have acted.. . . An ordinary breach of
> contract claim does not present an occasion for
> the remedies under the Consumer Protection Act.
> To create liability under the Consumer Protection
> Act, the objectionable act or practice must attain
> a level of rascality, that is dishonesty, that
> would raise an eyebrow of someone inured to the
> rough and tumble world of commerce.

This instruction necessarily implies willfulness or knowledge,
because conduct that is deceptive or unethical and that attains a
"level of rascality" which offends the usual competition of the
market must be deliberate and intentional.  See Kelton v. Hollis
Ranch, LLC, __ N.H. __, __ A.2d __, 2007 WL 2034008, *2 (July 17,
2007) (explaining how conduct that is deceptive or unfair implies
"a degree of knowledge or intent").  The jury's finding that
defendants had committed an "unfair or deceptive act or practice
in the conduct of any trade or commerce," RSA 358-A:2, therefore,

necessarily constituted a finding that defendants acted willfully or knowingly.

Additionally, because plaintiffs specifically alleged that defendants had acted willfully and knowingly, the jury was explicitly instructed on the meaning of a willful or knowing violation of the CPA:

> Plaintiffs claim that defendants' alleged violations of the Consumer Protection Act were willful and/or knowing.  A person or entity acts knowingly if it acts intentionally and voluntarily and not because of ignorance, mistake, accident, or carelessness.  Whether a person or entity has acted knowingly may be proven by the party's conduct and by all of the facts and circumstances surrounding the case.  A party acts willfully when it acts with knowledge that its conduct is unlawful and with the intent to do something the law forbids, that is to say, with the bad purpose to disobey or to disregard the law.  A party's conduct is not willful if it was due to negligence, inadvertence, or mistake.

This instruction immediately followed the instruction on what constituted a CPA violation.  Read together, these instructions fairly informed the jury that it was assessing the evidence to determine if defendants' conduct was sufficiently oppressive, unscrupulous or deceptive that it could be found to be a willful violation of the CPA.  See McFarlane, 491 F.3d at 59 (reviewing accuracy of instructions by assessing them as a whole).

6

In the context of these instructions, the special verdict form becomes clearer.  While the special verdict form did not specifically ask the jury whether or not defendants acted willfully or knowingly, it did ask "if the plaintiffs have proved by a preponderance of the evidence that defendants engaged in any unfair method of competition or any deceptive act or practice in violation of the [CPA]?"  In light of the entire charge and the evidence presented, that question can be fairly understood to have asked whether the CPA violation was willful.  See Johnson v. Teamsters Local 559, 102 F.3d 21, 28 (1st Cir. 1996) (examining the wording of the special verdict form in conjunction with the instructions to determine if together they fairly presented the issues to the jury).

Second, defendants have waived any objection they might now assert, because they failed to object to the jury instructions or the special verdict form, either during the charging conference or in the courtroom after the instructions were given.  See Fed. R. Civ. P. 51(b) & (c) (providing procedure for review of and objections to jury instructions and requiring objections to be timely made, on the record); see also Surprenant v. Rivas, 424 F.3d 5, 15 (1st Cir. 2005) ("A party's failure to adhere to the

protocol specified in Rule 51 constitutes a forfeiture and limits
appellate review to plain error."); <u>Muniz v. Rovira</u>, 373 F.3d 1,
6 (1st Cir. 2004) (citing precedent for the procedural default
resulting from defendant's failure to timely object to the jury
instructions).  "We enforce our object-or-forfeit rule 'to compel
litigants to afford the trial court an opportunity to cure [a]
defective instruction and to prevent the litigants from ensuring
a new trial in the event of an adverse verdict by covertly
relying on the error.'" <u>Baron v. Suffolk County Sheriff's Dep't</u>,
402 F.3d 225, 235 (1st Cir. 2005) (quoting <u>Flynn v. AK Peters,
Ltd.</u>, 377 F.3d 13, 25 (1st Cir. 2004)).  Although federal courts
may consider "a plain error in the instructions affecting
substantial rights that has not been preserved as required by
Rule 51(d)(1)(A) or (B)," Fed. R. Civ. P. 51(d)(2), the lack of a
specific question about willfulness on the special verdict form
did not constitute plain error here.

The plain error doctrine requires the litigant "to show, at
a bare minimum, that the alleged error seriously affected the
fairness or integrity of the trial." <u>Muniz</u>, 373 F.3d at 6.
Defendants have not made that showing.  They have not cited
anything in the record which supports a claim that the trial was

unfair because of the wording of the special verdict form.  My
review of the record leads to the conclusion that the trial in
fact was not rendered unfair by that wording.  The jury verdict
can fairly be understood as finding that plaintiffs prevailed on
their CPA claim because the evidence demonstrated that defendants
acted in an unscrupulous, unethical or immoral manner; in other
words, the jury concluded defendants had acted willfully.

Having disposed of defendants' objections, I turn to the
issue of whether the damage award should be doubled or trebled.
See RSA 358:A-10, I.  I find the evidence amply supported the
jury's determination that defendants treated plaintiffs unfairly,
and that Alam's decision to abruptly stop deliveries of gasoline
gave plaintiffs no choice other than to close their business,
which caused them significant financial hardship.  The evidence
readily supports the conclusion that Alam fully appreciated the
business implications of how he treated plaintiffs and willfully
engaged in a course of dealing with them that resulted in a
financial windfall to him at disastrous costs to them.

The evidence told the following story:

Alam is a sophisticated businessman, with a masters degree
in business administration and an established network of

gasoline-related businesses.[2]  By contrast, plaintiffs had no
business education and worked as social workers before embarking
on the entrepreneurial endeavor at issue in this matter.  The
business arrangement was based on an oral agreement between the
parties, which was not reduced to writing until four months after
negotiations began in September 2005.  Despite having the
assistance of counsel, Alam did not ensure that any contracts
were executed in advance of plaintiffs assuming control of the
leased premises, and did not explain plaintiffs' need for various
licenses and regulatory approvals to conduct the business of
operating a convenience store there.  These decisions of Alam's
seem to have been part of his ploy to entice plaintiffs into a
bad business deal.

    In October 2005, Alam turned the property over to plaintiffs
after they paid him $40,000, which transaction was documented
with a receipt that stated "fee to lease the premises."  While
plaintiffs testified that they believed this money constituted
prepayment of rent, Alam testified that the money was the price

---

[2]Testimony at the October 4 hearing established that Alam's
business endeavors have foundered in recent months; however, that
unfortunate turn of events for him does not affect the analysis
of his conduct during the seven month period from September,
2005, through March, 2006, when the ill-fated business
relationship at issue here occurred.

plaintiffs paid for the business.  The evidence, however, did not
substantiate Alam's claim.  To the contrary, it showed that
plaintiffs got nothing for the $40,000 other than leased space,
because there was no business to acquire.  The property they
rented was a dirty, empty building, without any going concern
value, store fixtures or inventory.  Plaintiffs invested
substantial time and money, working seven days a week, to
transform the space into a convenience store, to obtain the
necessary permits and licenses, to buy and stock inventory, and
to create goodwill.

    As part of the agreement, plaintiffs were required to buy
gasoline exclusively from defendants.  The exclusive supply
arrangement enabled defendants to control the price and quantity
terms of plaintiffs' fuel supply; however, the parties never
reached a meeting of the minds about the payment terms.  From the
beginning, the volume of gasoline listed on the delivery slips
did not correspond to the gauge on plaintiffs' tank.  The price
of fuel also caused problems, as defendants charged more if
payment was not received in full at the time of delivery, yet did
not provide either a total price or a price per gallon on the
delivery slip.  Instead, plaintiffs would call defendants later

in the day to be told the amount due.  Plaintiffs understood the
course of dealing allowed them to pay for fuel deliveries at the
immediate subsequent delivery, when cash would be available to
make the payment.  Alam, by contrast, testified that he expected
payment in full within two days of delivery and raised the price
if payment was not received within this time frame.[3]  At times
the "wholesale" price of gasoline charged plaintiffs exceeded the
retail price defendants sold gasoline for at a nearby station
they owned.  Finally, in spite of repeated requests for invoices
that corresponded to the delivery slips, to enable plaintiffs to
match quantities and prices with delivery dates, defendants did
not provide plaintiffs any itemized bills.

Despite these difficulties, on January 5, 2006, plaintiffs
executed documents which they believed reflected their oral
agreement and course of dealing with defendants.  The documents
included a promissory note for $10,000, a lease that was back-
dated to October 7, 2005, and a "Motor Fuels Product Sales
Agreement."  In addition to these documents, handwritten notes
pertaining to plaintiffs' contractual demands were also

---

[3]At the July 23 hearing, Alam testified, contrary to what he
said at trial, that it was common practice for a gas delivery to
be paid for at the next subsequent delivery.

introduced at the trial.  Those terms, however, were not
incorporated into the written agreements.  Almost immediately
after the documents were executed, defendants stopped delivering
gasoline, claiming plaintiffs owed nearly $20,000 for fuel.
Plaintiffs tried to reach Alam to resolve the payment issue to no
avail.  Without gasoline to sell, plaintiffs could not sustain
their convenience store and were forced to abandon the business.
Alam formally evicted them in March 2006, claiming they were
behind in rent and utilities obligations.

I find defendants' precipitous termination of product and
coercive eviction were both unethical and unscrupulous.  The
evidence of defendants shorting the fuel amounts delivered and
manipulating the price charged demonstrates both an unfair and
deceptive trade practice, designed to take advantage of
defendants' superior bargaining position.  Finally, the late-in-
the-game execution of documents, which defendants then relied on
to hold plaintiffs in breach of contract and evict them from the
property, appears to have been a sham effort to legitimize an
oppressive business deal.  The evidence consistently showed a
pattern of rascality that offends both the letter and the spirit
of the CPA.  Under such circumstances, I readily reach the

13

conclusion that a trebling of the damages awarded by the jury is warranted.  See e.g. In re Globe I, 129 B.R. at 321 n.19 (doubling damages but explaining they would have been trebled if defendant had "set up" plaintiff in a sham transaction or had appropriated to itself the value of the network and goodwill plaintiff had built without compensating plaintiff); see also Boynton v. Figueroa, 154 N.H. 592, 606-07, 913 A.2d 697, 709-10 (2006) (upholding judge's doubling of jury award as within his sound discretion); Pepsi-Cola Metro. Bottling Co. v. Checkers, Inc., 754 F.2d 10, 18-19 (1st Cir. 1985) (affirming trebling of damage award where CPA willfully violated when defendant refused to pay an uncontested debt to coerce plaintiff to deliver more product).  Accordingly, the jury award shall be tripled, to total $96,000.

**2.  Attorney's Fees and Costs**

Like enhanced damages, the amount plaintiffs, as the prevailing party, are entitled to receive for attorney's fees and costs is a question for the court.  See Attrezzi, LLC, 436 F.3d at 41; see also RSA 358-A:10, I ("a prevailing plaintiff shall be awarded the costs of the suit and reasonable attorney's fees, as determined by the court").  The court's primary focus must be on

the reasonableness of the rates charged and the hours spent, given the complexity of the issues involved.  See e.g. Gisbrecht v. Barnhart, 535 U.S. 789, 801-02 (2002) (explaining statutory fee-shifting adjudication); see also Globe Distrib. Inc. v. Adolph (In re Globe Distrib., Inc.), 145 B.R. 728, 732 (Bankr. D.N.H. 1992) (following same analysis for RSA 358-A:10 awards). At the July 23 hearing, defense counsel stated that defendants were not going to challenge the attorney's fees.  Accordingly, plaintiffs' counsel submitted to the court an itemized statement of his costs and fees.  See Document no. 44.  I have reviewed that statement and find the rates charged and the time spent to be reasonable, justifying an award of the total amount submitted to the court.  Plaintiffs' counsel is entitled to payment of $28,442.69, from defendants, pursuant to RSA 358-A:10, I.

<u>Conclusion</u>

For the reasons set forth above, it is hereby ordered:

1.  Plaintiffs are awarded the sum of $96,000, which represents the trebled damages assessed against defendants in this action; and

2.  Plaintiffs are entitled to costs and attorney's fees, in the amount of $28,442.69, to be paid by defendants.

15

Finally, the Clerk of Court shall mail a copy of this order to the New Hampshire Attorney General's Office, consistent with the requirements of RSA 358:A-10, II.

**SO ORDERED.**

James R. Muirhead
United States Magistrate Judge


Date:  November 2, 2007

cc:  Craig S. Donais, Esq.
     James W. Craig, Esq.

16